---

### In re LEA.

#### (District Court, D. Oregon. November 11, 1903.)

#### No. 4,714.

1. ALIENS—DEPORTATION—ACT MARCH 3, 1903.
   The authority conferred on the Secretary of the Treasury by section 21, Act March 3, 1903 (32 Stat. 1218, c. 1012 [U. S. Comp. St. Supp. 1903, p. 180]), to cause the deportation of aliens found in the United States in violation of said act, does not extend to aliens who entered the country before its passage, and when their entry was lawful, and the question of the time of the entry of an alien arrested and held for deportation thereunder is one involving the jurisdiction of the officers assuming to exercise such authority, and may be inquired into by a court on a writ of habeas corpus.

Habeas Corpus. Hearing on writ, return, and replication.

James Gleason, for petitioner.
John H. Hall, U. S. Atty.

BELLINGER, District Judge. This case was recently heard in this court on a demurrer to the return made to the writ by the United States immigrant inspector for this district, and the court, although of the opinion that the proceedings and warrant relied upon to justify the petitioner's imprisonment are unauthorized, overruled the demurrer for the reason that, upon the facts alleged, the petitioner was liable to deportation under the act of March 3, 1903 (chapter

1012, 32 Stat. 1214 [U. S. Comp. St. Supp. 1903, p. 172]), in a proper proceeding to that end. Thereupon the petitioner replied to the return, denying the facts so alleged. Upon the issues thus presented the testimony of the petitioner in her own behalf, and that of the two interpreters in behalf of the immigrant inspector, has been taken.

From the testimony of the interpreters, it appears that an inspector named Lavin, with Mr. Petrain, an attorney by profession, who acted as interpreter, went to a house of prostitution in this city where the petitioner was living, and represented to her that Lavin was looking for some girls that had come from Seattle, and inquired of her if she knew any such girls. Incidentally she was asked when she came to Portland. Mr. Petrain's recollection is that she said she had been here about three weeks, and that in answer to another question she stated that she arrived in New York in the early part of July of this year. This is according to the recollection of the witness, who says that he will not be positive as to such statement. Later in the day the petitioner was arrested by two policemen, and taken to the city jail, where her jewelry and pocketbook were taken from her. On the same day she was taken from the jail to the convent of the Good Shepherd, and from the latter place she was again returned to the jail, where she remained until 7 or 8 o'clock in the evening, when she was again taken to the convent, accompanied by Lavin and Mr. Petrain. These repeated visits to the jail were obviously intended to give force to the threats made to the petitioner in the interrogation that followed. Upon her return to the convent, with no one present but Lavin and Petrain, she was asked to be sworn on a crucifix. She refused. She was informed that she would have to be put under oath. She finally permitted herself to be sworn, but not on the crucifix. The examination lasted probably an hour. "Nothing was explained to her." She was not informed that she could call witnesses, or could have an attorney, or that she had any rights. Her statements as interpreted were reduced to writing by Lavin. This writing she refused at first to sign. Later, under pressure, she signed it. She had refused to answer many of the questions asked of her. She was threatened with different kinds of penalties—that she would have to remain in custody until she complied with the requests made of her to testify, and that if she did not answer correctly she would be sent to the penitentiary. The interpreter, in answer to a question, says, "It was a hard proceeding." He had read of such things as having occurred in the Middle Ages. Some two or three weeks later the petitioner, still being a prisoner at the convent, was subjected to a second interrogation, with another interpreter, who testifies that this investigation "must have taken a couple of hours, probably." The character of this proceeding, and its result, did not differ materially from that already had.

If the petitioner came to the United States in January of the present year, as she testifies, she is not within the provisions of the act of March 3, 1903. It is only by this act that it is made unlawful for women of her class not imported to enter the United States. The question as to whether she belongs to a class whose presence in the

country is unlawful has been committed to the political department of the government, and if her right depended solely on that question I should decline to consider her case further, since, notwithstanding the illegal proceeding under which she is held, she would still be liable to deportation. But, assuming that she belongs to a class of aliens not permitted by the act of 1903 to remain in the country, the question as to whether she was residing in the country at the time the law was passed is, in my opinion, like the question of alienage, one that involves the jurisdiction of the officers authorized by that law to deport aliens. If the petitioner is not within the operation of the law, she is not answerable to the authority conferred by it upon the administrative department of the government. Her rights in such a case are like those of a citizen. It will not be contended that a person claiming to be a citizen is concluded by the decision of the immigration officers that he is an alien. The petitioner testifies that she arrived in New York during last January. There is nothing to the contrary of this statement except the statement of Interpreter Petrain, who testifies that when he first saw the petitioner at the Paris House she stated, according to his recollection, and he will not be positive, that she came to the United States in the early part of July of this year. While undergoing cross-examination on this hearing, the petitioner testified as follows:

"Q. Did you not then state that you had come from France to the United States in the month of July, 1903? A. She told them she came about the last part of July or the first part of August. But she didn't know those people well; she says she didn't like to answer them. Q. Did she not say there, at that time and place, that she came from France to the United States in the month of July, 1903? A. She told them she came to Portland about the last part of July or the first part of August. Q. Tell her to answer the question, if she didn't tell Mr. Lavin in the presence of Mr. Petrain, at the Paris House, in this city, that she came to the United States from France in July, 1903. A. That is false, she says; she didn't say that."

From this testimony it appears that the witness did not at the first distinguish between coming to the United States and coming to Portland, or to "this country," by which she meant Portland. She says now, in answer to the first question above quoted, explaining the statement attributed to her by the interpreter, that she told them she came about the last part of July or the first part of August, and when the same question is repeated in the next interrogatory answers that she told them she came to Portland about the last part of July or the first part of August. The second answer explains the first, and makes it altogether reasonable to suppose that when answering the interpreter, as when answering the attorney for the United States on the hearing, she understood the question asked to refer to the time of her arrival in this state. In view of this testimony, the statement attributed to her, and relied upon to bring her within the purview of the act of 1903, is not worth considering, and it is against public policy that statements so procured should be given any effect in any place where justice is administered. No person's rights ought to be unfavorably affected by such testimony as this. In this state of the case, it must be presumed that

the witness testifies truthfully when she says that she came to New York in January of this year, and, if so, no question can arise affecting her, under the act referred to.

The petitioner is entitled to be discharged from the custody in which she is held; and it is so ordered.